AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Leanna Zamora<br>Lindsay Williams and<br>Shane Cratty<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)<br>)<br>)<br>)<br>)  3:19-71999  TSH |

**FILED**
DEC 11 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA



## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __September 13, 2019__ in the county of __Sonoma__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(C) | Distribution of fentanyl<br><br>Maximum penalties: Maximum 20 years imprisonment; 3 years to life supervised release following incarceration; $1 million fine; $100 special assessment; forfeiture; mandatory and discretionary denial of federal benefits |

This criminal complaint is based on these facts:

See attached affidavit of DEA SA Evan Ferguson

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Frank Riebli

_____
*Complainant's signature*
DEA SA Evan Ferguson
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/10/19

_____
*Judge's signature*

City and state: San Francisco, CA    Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Evan Ferguson, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, hereby declare as follows:

## I. INTRODUCTION

1. I submit this Affidavit in support of a criminal complaint charging Leanna ZAMORA, Lindsay WILLIAMS, and Shane CRATTY with distribution of a fentanyl resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and in support of warrants for their arrest.

2. I make this Affidavit based on personal knowledge obtained as a result of my direct participation in this investigation, conversations with other law enforcement officers who are familiar with this investigation, and upon information obtained from, but not limited to, the following sources which I believe to be reliable: oral and written reports about this investigation from various law enforcement agencies, including the Santa Rosa Police Department; reports and transcripts of eyewitness interviews; and laboratory and autopsy reports.

3. Because this Affidavit is made for the limited purpose of obtaining the complaint and arrest warrants, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the complaint and warrants. Unless otherwise indicated, where I recount actions, conversations, and statements of others, I recount them in substance and in part.

## II. AFFIANT'S QUALIFICATIONS

4. I am an investigator or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

5.  I am a Special Agent ("SA") employed by the DEA, and have been since October of 2018. I am currently assigned to the Santa Rosa Resident Office of the San Francisco Field Division. I am authorized and presently assigned to investigate and enforce violations of the Controlled Substance Act ("CSA") and other violations of federal law. I am the DEA case agent assigned to the investigation described in this affidavit, and in that capacity I have been working with officers from the Santa Rosa Police Department, which initiated the investigation (as described below).

6.  Prior to becoming a DEA Special Agent, I worked as a Texas State Police Officer with the Texas Alcoholic Beverage Commission ("TABC") from Sept 2013 until March 2018. During my employment with TABC, I conducted police investigations relating to drug trafficking, gambling, alcoholic beverage code violations, vehicular homicide, criminal negligence, as well as money laundering and other criminal acts relating to the alcoholic beverage industry. My training from TABC included: police procedure, operations, criminal law, criminal procedure, interviews and interrogations, defensive tactics, firearm proficiency, first responder first aid, use of deadly force, to include other police and investigative subjects. Prior to working for TABC, I was employed by the United States Army Criminal Investigation Command as a CID SA from June 2010 until Sept 2013, where I received instruction in felony level investigations to include; homicide, suicide, major theft, burglary, sexual assault, as well as crime scene processing, interview and interrogations, evidence handling and forensics techniques and executive protection. My duties as a US Army CID Special Agent included executive protection details, suicide investigations, and sexual assault investigations.

7.  During my employment with DEA, I received 16 weeks of full time, formalized training at the DEA Basic Agent Training Academy in Quantico, Virginia from July 2018 until October 2018. This included, but was not limited to: drug identification, detection, interdiction, undercover operations, money laundering techniques, transportation, concealment, sales of narcotics, investigation of individuals and organizations involving the smuggling, cultivation,

2

manufacturing, and illicit trafficking of controlled substances, interviews and interrogations, defensive tactics, firearm proficiency, and legal instruction.

8.  In the course of my duties as a SA, I have conducted or participated in physical surveillance, search warrants, informant debriefings, witness interviews, and reviewing recorded drug trafficking activities. I have also analyzed documents, telephones, real property, public records, and financial transactions for evidence of illegal narcotics trafficking. I have received several hundred hours of training in various investigative techniques, to include: controlled substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia and terminology, narcotics prices, field testing of narcotics, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled substances on abusers. Through my training, education and experience, I am familiar with identifying illegal drugs, the methods narcotics traffickers use to import, manufacture, and distribute illicit and illegal drugs, the payment methods for buying and selling illicit drugs, and the methods drug traffickers use to avoid law enforcement detection, including disguising the source and illegal nature of drug proceeds. I continue to keep informed about current and emerging narcotic trafficking trends and practices by reading periodicals, intelligence briefs, and training literature. I also maintain regular contact with Special Agents, and other law enforcement personnel to remain up to date with current trends of drug traffickers.

9.  I have had numerous conversations with other experienced DEA SAs, state and local officers regarding narcotics and narcotics-related subjects for the purpose of expanding and developing my expertise in the area of identification, sales, possession for sale, and distribution of narcotics and methods of operation of narcotics traffickers.

10. I have been involved in numerous interviews of cooperating sources, and individuals involved in illegal trafficking in drugs and other substances and have had numerous discussions regarding their various operations. I have read official reports of similar interviews by other experienced DEA SAs and other law enforcement officers that are experienced in drug

3

related investigations. As a result of my experience, I have encountered and become familiar with the day to day operations and the various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to possess, import, conceal, and distribute controlled substances.

11. My training and experience is based on my formalized training, as well as by drawing on knowledge of other DEA SAs, other federal agencies, and state and local law enforcement officers who are experienced in the field of investigating controlled substance violations. Additionally, I have had contact with narcotics traffickers and informants and have discussed with them the manufacture, importation, concealment, packaging, sales, use, distribution, and transportation methods utilized by narcotics traffickers and Drug Trafficking Organizations ("DTOs"). As a result, I have become familiar with the operations and the various tools, methods, trends, paraphernalia, conveyances, and related articles utilized by various traffickers in their efforts to manufacture, import, conceal, package, sell, use, distribute, and transport narcotics. Since starting my career at DEA, I have participated in investigations involving seizures of cocaine, methamphetamine, heroin, THC extract, and marijuana. I have also participated in investigations involving undercover operations, physical surveillance, and the monitoring of movements and habits of narcotics traffickers. I have participated in the execution of search and arrest warrants at narcotics traffickers' residences, vehicles and other buildings.

### III. PROBABLE CAUSE TO ISSUE THE COMPLAINTS AND ARREST WARRANTS

#### A. The Child Victim and the Father Victim Died as a Result of Fentanyl Intoxication.

12. On September 14, 2019 at approximately 12:50 p.m., officers from the Santa Rosa Police Department ("SRPD") and paramedics were dispatched to a house on Darek Drive in Santa Rosa for a report of an unresponsive male subject. When they arrived, they found a 13-month old boy (the "Child Victim") lying on the floor in a back bedroom. The Child Victim's mother had discovered him and was desperately attempting to resuscitate him.

4

Paramedics took over efforts to revive the Child Victim. Those efforts were unsuccessful. He was already deceased. An autopsy later determined that the Child Victim died from acute fentanyl intoxication.

13.     Police and paramedics also found a 29-year old male (the "Father Victim") on the floor in the bedroom. He was alive, but in extreme distress. They administered a dose of naloxone to the Father Victim, and transported him by ambulance to the hospital. During transport, the Father Victim said that he had used fentanyl. I know that naloxone is an opioid antagonist that can reverse the effects of a drug overdose due to opioids. I know that fentanyl is an opioid and a Schedule II controlled substance. The Father Victim went into cardiac arrest at about the time, or shortly after, he arrived at the hospital. The Father Victim died two days later after his family made the painful decision to withdraw life support. I have reviewed an autopsy report, which states that the Father Victim died from complications related to fentanyl intoxication.

14.     Officers found evidence of drug use in the bedroom where the Child Victim and the Father Victim were found. They found two scraps of aluminum foil, a straw, a lighter, and a chunk of a white substance, among other things. Those items were on the floor just a couple feet from where the Child Victim and the Father Victim were found. The DEA's Western Lab tested the foil scraps, straw, and chunk of white powder. One foil tested positive for methamphetamine and fentanyl residue. The other tested positive for methamphetamine residue. The straw was negative for controlled substances. The chunk of white powder was 0.218 grams of fentanyl.

**B.    ZAMORA, WILLIAMS, and CRATTY Supplied the Fentanyl that Killed the Child Victim and the Father Victim.**

15.     For the reasons stated below, I believe that the Father Victim purchased approximately one gram of fentanyl on September 13, 2019. I further believe that Lindsay WILLIAMS set up the transaction and that Leanna ZAMORA supplied the fentanyl. I believe that Shane CRATTY drove Lindsay WILLIAMS to meet ZAMORA near ZAMORA's place of work in Santa Rosa, and that the Father Victim followed them in his own vehicle. I believe that

5

WILLIAMS met with ZAMORA and gave ZAMORA the money for the fentanyl. ZAMORA gave the fentanyl to WILLIAMS. WILLIAMS then gave the fentanyl to CRATTY and CRATTY delivered it to the Father Victim.

16.  SRPD officers recovered the Father Victim's cell phone from the bedroom where he was found. Analysis of the Father Victim's cell phone indicated that the Father Victim contacted a person, T.B., at a telephone number ending in -2821 several times on September 13, 2019, beginning at about 1:34 p.m. Further evidence from the Father Victim's phone, and a preliminary analysis of historical cell tower data, indicate that the Father Victim went to T.B.'s house on Gilbert Drive in Santa Rosa at about 2:30 p.m. that day and stayed there until approximately 3:30 p.m. The Father Victim then left, but returned a little over an hour later.[1]

17.  SRPD officers spoke to T.B. T.B. said that the Father Victim had contacted T.B. on September 13, 2019, seeking fentanyl. T.B. contacted another person, A.E., to ask if A.E. could set up the deal for the Father Victim. SRPD officers also spoke to A.E. A.E. admitted that T.B. had contacted A.E. looking for fentanyl. A.E. said he contacted WILLIAMS to obtain the fentanyl. I have reviewed text messages recovered from WILLIAMS' phone that confirm this contact from A.E. At approximately 3:00 p.m. on September 13, 2019, A.E. wrote, "Hey Linds give me a call back asap please. I need a price check on the fetty. I want to get a G but need to know the price first.." WILLIAMS responded, "125". A.E. asked, "How quick could you get me a G??" WILLIAMS responded "After work". I know from my training and experience and conversations with more experienced agents and officers, that "fetty" is street slang for fentanyl, and that "G" is shorthand for a gram. I believe that "Linds" is short for "Lindsay," WILLIAMS' first name. I believe this message shows that A.E. asked WILLIAMS how much it would cost to

---

[1]  Based on text messages recovered from the Father Victim's phone, a preliminary analysis of historical cell tower data, and an interview with the Father Victim's former employer, I believe the Father Victim left T.B.'s house to go pick up his final "paycheck" from his employer. I further believe that the Father Victim picked up the money – approximately $1,500 – at approximately 3:40 p.m.

6

purchase a gram of fentanyl. WILLIAMS responded that it would be $125. According to the Child Victim's mother, the Father Victim typically purchased a gram of fentanyl at a time.

18. WILLIAMS later told A.E. that, "Who I get it from don't get off til 6 but we could go to they're work and get it if u wanna drive". A.E. asked where WILLIAMS' source worked, and WILLIAMS responded, "Cartunes on the ave". I know that Car Tunes is a car stereo store on Santa Rosa Avenue in Santa Rosa. ZAMORA later admitted to police that she worked at Car Tunes. I believe that WILLIAMS meant that her source of fentanyl, ZAMORA, might be available after work to sell the drug.

19. I believe that the Father Victim returned to T.B.'s house at about 4:48 p.m.[2] At about that same time, A.E. sent WILLIAMS another message saying that he was "just waiting on the money to pull up and then ima pull up on u". WILLIAMS responded twenty minutes later: "How long until the money gets there cu we wanna catch her right when she gets off work or before cuz after if she has to go meet up with her bitch I can't get it". I believe that, in this exchange, A.E. and WILLIAMS were discussing when the Father Victim would arrive with the money needed to purchase the fentanyl, and WILLIAMS was warning A.E. that they had to buy the fentanyl shortly after WILLIAMS' source finished work because WILLIAMS' source might not be available later.

20. A preliminary analysis of historical cell tower data indicates that a cell phone CRATTY used arrived in the area of T.B.'s house between 4:15 p.m. and 5 p.m. According to A.E., he asked CRATTY to give WILLIAMS a ride to pick up the fentanyl for the Father Victim. A few minutes after WILLIAMS's text message, above, CRATTY sent WILLIAMS a message saying, "Hey this is [A.E's] brother, where are you exactly? I'm about 7 or 8 minutes from the jc". I believe that this message indicates that CRATTY was on his way to pick up WILLIAMS and drive her to meet her fentanyl source. According to A.E., the Father Victim left

---

[2] Analysis of the Father Victim's and T.B.'s cell phones indicates numerous calls or attempted calls between them between approximately 3:45 p.m. and 4:48 p.m. The last call was at 4:48 p.m. Further, a preliminary analysis of historical cell tower data indicates that the Father Victim's phone returned to the area of T.B.'s house at about that time.

at about the same time CRATTY did. Historical cell tower data indicate that the cell phones CRATTY, WILLIAMS and the Father Victim used traveled south, to the area near Car Tunes, on Santa Rosa Avenue, and that they were in that area until approximately 6 p.m.

21. In a subsequent interview with police, CRATTY admitted that the Father Victim followed him and WILLIAMS when they drove to the area of Car Tunes to meet ZAMORA. CRATTY told police that they all met in the Target parking lot, near where ZAMORA worked. He said that WILLIAMS met with ZAMORA and got the fentanyl and then returned to CRATTY's car. He said that the Father Victim then came to CRATTY's car and got the fentanyl from WILLIAMS. He also said that he might have handed the fentanyl to the Father Victim, but could not remember.

22. SRPD officers arrested WILLIAMS and ZAMORA on September 18, 2019. In recorded jail calls after their arrests, both made statements about the transaction. In a call to her mother, WILLIAMS said that "[i]t wasn't even us selling to [the Father Victim]. It was this other guy who handed it to [the Father Victim]." WILLIAMS' mother asked, "Who is he?" WILLIAMS responded, "Shane Cratty." In a call with another person, WILLIAMS identified ZAMORA as the person who gave her the fentanyl. "But," she added, "it wasn't even her who gave it to [the Father Victim], it was Shane Cratty who gave it to him." Based on these calls, I believe that WILLIAMS was identifying ZAMORA as the source of the fentanyl and CRATTY as the individual who handed the fentanyl to the Father Victim.

23. ZAMORA described the transaction the same way. In a recorded jail call to her friend, ZAMORA said, "Baby, the bag I sold Lindsay, she sold it to [the Father Victim]." ZAMORA added, "It's fucked up, because I didn't even know [the Father Victim], ok? They are the motherfuckers that gave it to him, not me." In a later call with the same friend, ZAMORA said, "Lindsay's the one who got it from me, and then gave it to Shane, and then Shane gave it to him." I believe that, in these calls, ZAMORA's references to "Lindsay" and "Shane" mean WILLIAMS and CRATTY, respectively.

8

24. In a post-arrest interview, ZAMORA told SRPD officers that she got her fentanyl from a dealer in the Tenderloin area of San Francisco. Police asked her, "So that fentanyl that you gave Lindsay some of, right? That she bought from you? . . . Where did you get that?" ZAMORA responded, "Hondo. . . . Honduran." The detectives asked, "Hondurans? How does that work?" "You go there and if you speak Spanish, they'll fuck with you, you know?" ZAMORA said. "Where do you go?" the detective asked. "[S]traight to the TL," ZAMORA responded. I know from my training and experience, and from conversations with more experienced agents and officers who have investigated drug trafficking in the Bay Area, that "TL" is shorthand for the Tenderloin, which is an area in San Francisco where many dealers sell their products in what is essentially an open-air drug market. In saying "they'll fuck with you, you know," I believe that ZAMORA meant that, if a customer spoke Spanish, the people whom she identified as Honduran would sell drugs to that customer.

25. According to A.E., the Father Victim returned to T.B.'s house after the transaction, went into the garage with A.E. and A.E.'s girlfriend and the three used some of the fentanyl the Father Victim had just acquired. The Father Victim then left. Cell tower data for the Father Victim's phone indicate that the Father Victim arrived in the area of his home at approximately 7:20 p.m.

26. The Father Victim and the Child Victim's mother had agreed that the Child Victim would stay with the Father Victim that night. At approximately 10:06 p.m., the Father Victim took a picture of the Child Victim sleeping on the Father Victim's bed. The Father Victim sent it to the Child Victim's mother, along with a message, "Daddy did good I'm so proud of myself". The Child Victim's mother responded, in part, "I'm so proud Of you too!!" The Child Victim's mother told police that the Father Victim often had a hard time getting the Child Victim to sleep because the Child Victim just wanted to play with the Father Victim whenever they were together. At about 11:09 p.m., the Father Victim had a nine-minute FaceTime call with the Child Victim's mother. Though it was dark in the background, she could see that the Child Victim was still asleep on the Father Victim's bed. She also noticed that the

9

Father Victim's speech was slow, but she thought it could be due to sleep medication he sometimes took. At 11:28 p.m., the Father Victim sent her a message, "Night baby girl". It was the last message she received from him.

27. The Father Victim's last outgoing text message was a minute later, to a phone number ending in -9031. The Father Victim said, "Sounds good cool ahvrvhmobtt". The other party asked, "You good?" The Father Victim did not respond.

28. The next morning, the Child Victim's mother learned that the Father Victim had not dropped the Child Victim off with his sister, who had agreed to watch the Child Victim while both the Child Victim's mother and the Father Victim worked. The Child Victim's mother tried multiple times to reach the Father Victim, but was unable. A little after noon, she sent the Father Victim a message, "Hey I'm Hella worried about you guys can you just text me back and let me know that you're OK". When she received no response, she went to the Father Victim's house. The landlady let her into the house. She went straight back to the Father Victim's room, and there she discovered her son, lying on the floor of the Father Victim's room. She called 9-1-1 and frantically tried to revive him, but she could not. He was already dead.

29. The landlady told police that she heard the Child Victim cry twice during the night: once around 10 p.m. on September 13, 2019, and once in the early morning on September 14, 2019, while it was still dark outside.

30. I am not aware of any evidence that the Father Victim obtained or sought to obtain fentanyl from any other source after the transaction with ZAMORA, WILLIAMS and CRATTY. The Child Victim's mother told police that, when the Father Victim was using, he would use about a gram of fentanyl per day, and that he would use it up in multiple doses over the course of the day.

## IV.   CONCLUSION

31. Based upon the foregoing, I submit that there is probable cause to believe that WILLIAMS brokered a fentanyl transaction between ZAMORA and the Father Victim, and that

CRATTY drove WILLIAMS to meet with ZAMORA. I further submit that there is probable cause to believe that ZAMORA handed the fentanyl to WILLIAMS, that she handed the fentanyl to CRATTY, and that CRATTY delivered the fentanyl to the Father Victim. I further submit that there is probable cause to believe that the Father Victim used the fentanyl that evening and became incapacitated, and that the Child Victim ingested some of the fentanyl that the Father Victim had not used. I submit that there is probable cause to believe that the Child Victim and the Father Victim suffered serious bodily injury and died as a result of the fentanyl that ZAMORA, WILLIAMS and CRATTY distributed.

32.  For these reasons, I request that the Court issue criminal complaints against Leanna ZAMORA, Lindsay WILLIAMS, and Shane CRATTY, charging them with distribution of fentanyl resulting in serious bodily injury and death.

I swear under penalty of perjury that the foregoing are true and correct to the best of my knowledge.

_____
EVAN FERGUSON
DEA Special Agent

Subscribed and sworn to before me this 10th day of December, 2019, in San Francisco, California.

_____
HON. THOMAS S. HIXSON
United States Magistrate Judge